IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 4:19-cr-237 |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY SCOTT DWOREK, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

**INTRODUCTION**

On December 18, 2019, the government obtained a ten-count indictment charging the defendant, Jeffrey Scott Dworek, with acts of mail fraud on specific dates in 2015, 2016, and the beginning of 2017, in violation of 18 U.S.C. § 1341.  On July 10, 2020, Mr. Dworek formally accepted responsibility by pleading guilty to count one, which alleged mail fraud on January 30, 2015, pursuant to a written plea agreement.  The agreement calls for dismissal of the remaining counts at the time of sentencing, stipulates that the loss amount under the advisory sentencing guidelines exceeds $550,000, stipulates that an abuse of position of trust enhancement under the advisory sentencing guidelines should apply, and agrees that restitution should be ordered for all relevant conduct related to the offense.  The Court accepted his guilty plea on July 28, 2020.

The presentence report drafter determined that Mr. Dworek's base offense level under the advisory sentencing guidelines is 7. (PSR ¶34).  Because the loss amount under the guidelines exceeded $1,500,000 but is less than $3,500,000, sixteen additional levels were added. (PSR ¶35).  Because the offense involved sophisticated means, two additional levels were added. (PSR ¶36).  Because Mr. Dworek abused a position of trust in a manner that significantly facilitated

commission of the offense, two more levels were added. (PSR ¶38). After applying a three-level reduction for acceptance of responsibility (PSR ¶¶42, 43), and calculating his criminal history category as II (PSR ¶50), the presentence report drafter found a total offense level of 24, and an advisory sentencing guideline range of 57 to 71 months of imprisonment. (PSR ¶91). The parties agree and recommend that restitution in the amount of $1,628,913.00 should be imposed. The remaining only issue before the Court is what sentence is "sufficient, but not greater than necessary" under the 18 U.S.C. § 3553(a) factors in this case.

## ARGUMENT

In 1996, Jeffrey Dworek started working for the Metro Waste Authority (MWA) as the Director of Operations. (PSR ¶13). MWA is an independent government agency responsible for solid waste collection and disposal for the metro Des Moines area. (PSR ¶12). It is managed by an Executive Director, and governed by a Board of Directors that consists of one elected official from each of sixteen communities that are part of the MWA. *Id*. As Director of Operations, Mr. Dworek was responsible for reviewing and signing off on vendor invoices to be paid out by MWA. (PSR ¶13).

In the summer of 2012, Mr. Dworek began submitting fraudulent invoices to MWA for payment. He created a South Dakota corporation called Britad, and had MWA pay Britad for services that were not performed. (PSR ¶¶15–16). He also colluded with MWA vendor Barker Lemar, to submit false invoices to MWA from fictitious companies Lemar Programming Company (LPC), and International Telemetry Technologies (ITT), for payment. (PSR ¶¶16–17). The LPC and ITT entities were also submitting funds to Mr. Dworek's Britad business checking account, which suggests Mr. Dworek was receiving kickbacks for facilitating the payments to LPC and ITT. (PSR ¶¶17, 29). Mr. Dworek engineered fraudulent payments by MWA from

May 15, 2012, through January 30, 2017, totaling $1,146,563 to the Britad entity, that were deposited into the business checking account of Mr. Dworek and his wife. (PSR ¶29). The LPC and ITT entities paid a total of $390,667 into the same account over that time span. *Id*.

The fraud scheme came to light after a new director of the MWA began reviewing MWA's vendors and asking Mr. Dworek about payment for unprovided services or duplicative services. (PSR ¶14). MWA contacted the State Auditor's Office to further investigate the MWA, which led to the discovery of the fraudulent payments related to Britad, LPC, and ITT. (PSR ¶17). The CEO of Barker Lemar was later interviewed by law enforcement in June of 2019, who indicated that she learned of the fraud by Tracey Lemar and Mr. Dworek during an April 2018 meeting with the MWA director, and then confronted Lemar about it. (PSR ¶25). Tracey Lemar resigned from Barker Lemar after the meeting, but would not disclose who owned the ITT entity, or anything about it. (PSR ¶27). Further internal review by Barker Lemar and MWA showed that the Britad entity and Barker Lemar were billing MWA for the same services, but Barker Lemar had documentation for all the actual services it had provided. (PSR ¶28). Two months after the meeting between Tracey Lemar and the CEO of Barker Lemar, Mr. Lemar committed suicide. (PSR ¶16).

Subsequently, in August of 2019, Mr. Dworek, who was no longer with MWA by that point, was interviewed twice by law enforcement officials. (PSR ¶19). He initially said that Britad was his wife's company, that she and their daughters operated it, and that the family would construct control boxes utilized by MWA. *Id*. But he soon admitted that Britad was his company, that he never told MWA of his involvement with the company, that it had no expenses or payroll, did not file taxes, and was receiving materials and supplies for free from ITT. (PSR ¶19). He further admitted that he was preparing the Britad billing invoices, mailing them to

MWA, approving the payouts at MWA, and then picking up the checks and depositing them into his personal bank account. (PSR ¶20).  He also acknowledged the payments from LPC and ITT, and stated that he worked regularly with Barker Lemar employees Mike Barker, Tim Buelow, and Tracey Lemar when he was with MWA, and stated that ITT was one of Tracey Lemar's companies. (PSR ¶¶21–22).  During her own interview with law enforcement officials, Mr. Dworek's wife had little knowledge of Britad, and stated that Mr. Dworek and Tracey Lemar started the company. (PSR ¶24).

The indictment in this case was returned a few months after the interview of Mr. Dworek.  He appeared on the charges on December 20, 2019.  He quickly indicated his intent to acknowledge his guilt and accept responsibility for his offense, and the parties worked together to get through the discovery process and work out a plea agreement in a timely fashion.  The nature of the case and the volume of discovery, combined with the upheaval caused by the impact of the COVID-19 pandemic in early 2020, caused some delay in the process.  But Mr. Dworek never wavered from accepting responsibility for his offense, and continued to work with the government toward a resolution, which culminated in the plea agreement that Mr. Dworek signed on July 2, 2020, and with him formally entering the guilty plea via remote video proceeding on July 10, 2020.  The question before the Court is now what sentence is "sufficient, but not greater than necessary" to impose on Mr. Dworek.

Mr. Dworek is deeply ashamed about what he did.  There is no dispute in this case that he abused his position of trust at MWA to embezzle money to which he was not entitled.  After exhausting his savings by providing for his ailing parents until they passed, he was unable to continue to provide a lifestyle for himself and his family to which they had become accustomed, and rather than accept and adapt to that reality and tell his family what was happening, he took

advantage of the structure of MWA's payment system and his status to steal money to maintain the same lifestyle by funneling funds into the Britad entity he created. (PSR ¶57).  He also assisted Tracey Lemar's apparent theft of funds in the same manner, by signing off on invoices for the LPC and ITT entities under Lemar's control that claimed to be doing the same work as the Barker Lemar company.  Mr. Lemar's death has made it difficult to fully ascertain his exact role in the entirety of the scheme, as related to the ITT and LPC entities.

     While the scope of this offense is very serious, because it occurred over several years and involved a substantial amount of money, Mr. Dworek has minimal criminal history.  His only prior conviction consists of a 2016 arrest for operating while intoxicated, for which he served two days in jail, was fined, and successfully discharged probation. (PSR ¶47).  Because this offense was transpiring during the time he was on probation, he receives an additional two criminal history points under the advisory guidelines, which elevates him to criminal history category II. (PSR ¶¶49–50).  During his probationary term, he completed a substance evaluation, completed the weekend operating while intoxicated program, performed 50 hours of community service, and paid the monetary obligations for the offense. (PSR ¶47).  His term of pretrial release has been largely uneventful over the past year, with his only violation being use of marijuana days after his initial appearance. (PSR ¶9).  The violation occurred in Colorado, which is a marijuana-legal state, and Mr. Dworek admitted the use to his Colorado pretrial officer during the intake interview there on January 7, 2020.  He was placed on a random testing schedule, and has had no further issues.[1] *Id*.  Clearly, Mr. Dworek is someone who can work

---

[1] The presentence report notes that Mr. Dworek has failed to surrender his passport. (PSR ¶9). But Mr. Dworek was honest and informed the Court and pretrial services that he did have a passport, both during his initial appearance and at his change of plea hearing, while noting that

with a probation officer or other supervisory authority, which bodes well for his ability to receive correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2)(D).

Furthermore, Mr. Dworek is now 55 years old. (PSR ¶55). He has struggled with alcohol consumption to various degrees throughout his life, to the point he accrued the OWI referenced above, and where his wife has been concerned about his drinking. (PSR ¶68). His father was an alcoholic, and Mr. Dworek may have inherited some of his struggles with intoxicants from him. (PSR ¶58). Mr. Dworek started drinking regularly in high school, also smoked marijuana until college, and then used cocaine socially in his early twenties until his marriage. (PSR ¶¶68–70). But while the other substances are not really part of his life anymore, his battle with alcohol use has continued over the years. He has used alcohol to help himself sleep, and appears to have periods where his social use becomes magnified to the point where it has become concerning to his loved ones. (PSR ¶68). Mr. Dworek has suffered from depression and anxiety for years to various degrees, for which he is prescribed alprazolam (Xanax) and escitalopram (Lexapro). (PSR ¶66). The interplay between substance use and mental health disorders is widely known, and it would not be surprising if Mr. Dworek's past periods of problematic substance use coincided with his worst mental health episodes. Indeed, his wife noted to the presentence report drafter that she believes Mr. Dworek's family "destroyed" him, by putting the responsibility for their care onto him financially, and that his mental health deteriorated and he went into a period of heavy drinking after his parents had both passed away, and that he never got any help to deal with the situation. (PSR ¶57).

---

he does not know where the passport is located because of his relocations over the past few years and the separation from his wife.

Growing up, Mr. Dworek had a good childhood in Pennsylvania. (PSR ¶55). He was raised in a suburb of Pittsburgh, his basic needs were always met, and he did not experience any physical or sexual abuse. *Id*. His family was apparently wealthy until the divorce of his parents, after which the financial burden for his parents' care fell largely onto him as they aged. (PSR ¶57). His father's alcoholism led to the dissolution of his parents' marriage when Mr. Dworek was a teenager, after which he experienced some emotional abuse related to their stress about the separation and his father's continuing alcohol problem. (PSR ¶55). Despite this additional stress during his teen years, Mr. Dworek did well in school, and went on to earn a Bachelor of Science degree in Aerospace Engineering from Penn State University. (PSR ¶¶74–75). A couple years of completing his undergraduate studies, he married, and eventually had two daughters, both of whom are now adults. (PSR ¶61).

In 1996, the family relocated to Des Moines, after Mr. Dworek was hired by MWA as the Director of Operations. (PSR ¶83). Mr. Dworek worked for MWA for over twenty years, and was a respected employee, in a high position of responsibility. He continued to add to his skill set while working for MWA by attending the University of Iowa from 2002 to 2004, again doing well academically, and obtaining a Master of Business Administration degree. (PSR ¶76). Working for MWA was his career, and he built a nice life that he has thrown away through his commission of the offense in this case.

Indeed, along with the sanction the Court will impose on Mr. Dworek for the commission of this offense, his actions have devastated his public and personal life. He and his wife of over thirty years have separated because of his conduct. (PSR ¶61). She reported to the author of the presentence report that the offense in the case "destroyed" their marriage, and that she is unsure if their relationship is repairable. (PSR ¶57). One of his daughters is also struggling with how to

deal with Mr. Dworek's actions, and is not really speaking to him at this point. (PSR ¶61).  He is doing what he can to try to repair those relationships, but recognizes that his own actions have created these circumstances.

Perhaps as a coping mechanism, and to his credit, Mr. Dworek has always worked, and found new work quickly after resigning from MWA when his offense behavior was discovered.  Prior to being indicted, he worked in South Carolina and Nashville throughout most of 2018 and 2019. (PSR ¶¶81–82).  After the indictment caused his resignation from Waste Management in Nashville, Tennessee, he again found work a few months after appearing on the charges in this case. (PSR ¶¶79–81).  He was first employed at Lowe's for a month as a nighttime merchandising associate, and since April 2020 has worked full time for Elite Line Services in Oklahoma as a control systems lead, which has Amazon as a major client and is part of the distribution chain. (PSR ¶78).  He enjoys the work, is a valued employee, and is motivated to pursue this new career path going forward. *Id*.  While the consequences of his conviction in this case limit and will inhibit his future employment opportunities, he is committed to rebuilding a decent and stable life, where he can support himself while paying toward the restitution that must be imposed as part of the sentence in this case, and his ability to find work despite his circumstances indicates he will likely be able to provide toward restitution in the future. *See* 18 U.S.C. § 3553(A)(7).

As noted above, Mr. Dworek has minimal criminal history, and the characteristics of someone that will respond well to correctional and rehabilitative treatment.  He recognizes the seriousness of his offense, regrets and is deeply ashamed of his actions, and fully accepts responsibility for his conduct.  He does not pose any particular threat to the public that necessitates him being incapacitated by a long term of incarceration, and the Court has a wide

variety of options available to it to utilize in crafting an appropriate sentence for him in this case that reflects the seriousness of the offense, promotes respect for the law, and to provide a just punishment. *See* 18 U.S.C. § 3553(a)(2)(A)–(C).  He has adapted well to pretrial release over the past year, and will doubtlessly comply with whatever is asked of him during supervised release, while posing no problems for the Bureau of Prisons during any term of incarceration that the Court elects to impose.  He respectfully requests that the Court order mental health and substance abuse evaluation and treatment as part of the sentence imposed in the case, because he believes those are areas of need for him.

Any sentence the Court imposes in this case will be sufficient to adequately deter Mr. Dworek from future criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B).  This is especially true now, when the COVID-19 pandemic continues to rage unabated throughout the country.  Given that jails and prisons are essentially incubators for the virus, the efforts to slow the spread of the contagion have come at the expense of correctional and rehabilitative programming within the Bureau of Prisons, as the facilities have restricted inmate movement within the facilities, and essentially resulted in the "warehousing" of most federal inmates. *See* Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8): 1047-1055 (2007), (December 31, 2020, 11:00 AM), https://doi.org/10.1086/521910 (noting that of confinement in a prison setting are optimal for the transmission of contagions).  And, while Mr. Dworek is in relatively good physical health, his high cholesterol and history of hypertension do increase his risk of complications if he does contract the virus. (PSR ¶65); *see also* CDC Centers for Disease Control and Prevention, *COVID-19*, (December 31, 2020, 11:15 AM), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (stating that, based on currently known information, adults of any age with hypertension or high blood

pressure "might be at an increased risk for severe illness from the virus that causes COVID-19). Until the recently approved vaccines are acquired in sufficient dosages and a system of dispensing them quickly to vast portions of the population is effectively implemented, the prison setting will remain harsher than it already was prior to the pandemic, and the community resources more circumscribed and limited during the supervised release term. *See United States v. Davidson*, 2020 WL 4877255 at *22 (W.D. Pa. August 20, 2020) (noting that a prison sentence becomes "significantly more laborious and difficult" if an inmate is subjected to quarantine procedures or contracts the virus). The Court can take this reality into account when assessing what the "sufficient, but not greater than necessary" sentence to impose on Mr. Dworek is in this case.

The advisory sentencing guidelines recommend a sentence of from 57 to 71 months of imprisonment be imposed in this case. But the overarching question for the Court is what sentence is "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a), of which the advisory guidelines are but one factor. The individual history and characteristics of an individual are not factors that are easily quantified, are largely not factored into the calculus of the advisory guidelines for that reason, and is therefore left for consideration under 18 U.S.C. § 3553(a)(1) when making the sentencing determination. And while the Court must also consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct under 18 U.S.C. § 3553(a)(6), that requirement is fulfilled by considering the advisory sentencing range and then tailoring the sentence based on the other factors unique to the case and individual being sentenced. *See Gall v. United States*, 552 U.S. 38, 54–56 (2007) (approving the district court's analysis of why a below-guideline sentence for the particular defendant under the circumstances of the case did not violate the requirement to avoid

unwarranted sentencing disparities); *see also Rita v. United States*, 551 U.S. 338, 348 (2007) (observing that the sentencing commission attempts to fulfill the 18 U.S.C. § 3553(a) objectives at "wholesale," while the sentencing judge does so at "retail."). Mr. Dworek acknowledges the seriousness of his offense and his moral and legal failings, is remorseful for what he has done and accepts responsibility for his actions. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). He accepts the sentence the Court assesses under the section 3553(a) factors, and regardless of what that is, he will work toward making amends as best as he can while he builds a new life and moves forward in the future.

Respectfully submitted,

 */s/ Joseph Herrold*
Joseph Herrold
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: joe_herrold@fd.org
ATTORNEY FOR THE DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2021, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

*/s/ Morgan Conn*, Paralegal